IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEFFREY PAICH,                          )
                                        )
            Plaintiff,                  )
                                        )
      vs.                               )      Civil Action No. 06-1442
                                        )
NIKE, INC.,                             )
            Defendant.                  )
                                        )

AMBROSE, Chief District Judge


**OPINION AND ORDER**

<u>Synopsis</u>

Plaintiff Jeffrey Paich ("Paich") brings this action pursuant to Title VII of the Civil Rights

Act of 1964, and its state counterpart, the Pennsylvania Human Relations Act, asserting claims

of reverse gender discrimination, hostile work environment and retaliatory discharge.  In short,

Paich, a store manager, alleges that he was terminated from his employment as a result of his

gender and because he reported gender discrimination claims against his district manager, a

woman.  Defendant has moved for summary judgment dismissing the action in its entirety

[Docket No. 41].  For the reasons set forth below, I grant Defendant's motion for summary

judgment dismissing Plaintiff's claims of reverse gender discrimination and hostile work

environment, and deny Defendant's motion for summary judgment with respect to the retaliation

claims.

I. **Legal Standard**

In order to prevail on a motion for summary judgment, the moving party must

demonstrate that "there is no genuine issue of material fact and. . .the moving party is entitled

to judgment as a matter of law."  <u>Jurimex Kommerz Transit G.M.B.H. v. Case Corp.</u>, 2007 WL

2153278, at *1 (3d Cir. July 27, 2007) (quoting Fed. R. Civ. P. 56(c)). "[W]here the party

opposing a motion for summary judgment bears the ultimate burden of proof, the moving party

may discharge its initial burden of showing that there is no genuine of material fact by showing -

that is, pointing out to the district court - that there is an absence of evidence to support the

nonmoving party's case." Player v. Motiva Enter., LLC, 2007 WL 2020086, at *9 n.4 (3d Cir.

July 13, 2007). "If the moving party has satisfied its initial burden, the nonmoving party must, in

their opposition to the motion, identify evidence of record that creates a genuine issue of

material fact." Id. Moreover, "[t]o defeat a motion for summary judgment, the non-moving party

must 'do more than simply show that there is some metaphysical doubt as to the material facts.

In the language of the Rule, the non-moving party must come forward with specific facts

showing that there is a genuine issue for trial. ' " Jurimex Kommerz Transit G.M.B.H., 2007 WL

2153278, at *1 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-

87 (1986)).

## II.  Statement of Relevant Facts

The parties have gone to great length to dispute the accuracy and the admissibility of

each other's assertions of fact.[1]  Having carefully reviewed each side's submissions, I parse the

following facts most relevant to my decision.

### Plaintiff's Employment History With Nike

Paich was hired on August 30, 2000 to be the store manager for the Nike Grove City

Factory Store.  The hiring decision was made by Chris Griesmer, a male and the District

Manager of Defendant's Grove City store.  Paich replaced Nike's former female store manager,

Karen Haas.  Paich understood that as a store manager, he was responsible not only for the

---

[1] Defendant's motion to strike inadmissible allegations, [Docket No. 65], is addressed in Part IV of this opinion.

financial performance of the store, but for managing the employees of the store, including maintaining a pleasant work environment for those employees. [Docket No. 43, at 2; Docket No. 64, at 2.]

On or about June 19, 2001, Paich was given a year-end evaluation by Griesmer, his District Manager. Paich was given an overall rating of "Meets Expectations" for his performance. [Docket No. 44-3, at 20-25.] This rating was the third highest of five categories. [Id.]

In June 2001, Griesmer was replaced as District Manager by Debra Sweda. Sweda began with Nike in 1989 as a store manager. Although the number and location of the stores in her territory has changed over time, she has been responsible as District Manager for between seven and eleven Nike stores, including the Grove City store. According to Nike, in January 2001, 71% of the store managers in Sweda's district were male, and that percentage has remained constant or increased during her tenure as district manager. [Docket No. 44-10, at 10.]

Paich received his first year-end evaluation from Sweda in June 2002. Sweda gave Paich an overall performance rating of "Achieves," one level higher than Paich had received from Griesmer. [Docket No. 44-3, at 30.] She gave Paich a 4% salary raise, which also exceeded the raise he had previously received from Griesmer. [Docket No. 43, at 4; Docket No. 64, at 5.]

Following Paich's first year-end evaluation, the record is repleat with complaints regarding Paich's performance. According to Sweda's declaration, she began to receive complaints about Paich from store employees beginning in September 2002. For instance, in September 2002, a pregnant female employee filed an anonymous complaint against Paich, alleging that Paich had verbally warned her for being late despite her medical excuse and had

called her doctor himself to confirm her illness, that she and other employees had heard him cursing and that he had referred to a female job candidate as "yummy in the tummy." [Docket No. 44-10, at 14; Docket No. 44-12, at 7.] That same month, an assistant store manager at the Grove City store told Sweda that Paich had severe mood swings and exhibited extreme anger, had pushed a cart in anger frightening an employee and making her cry, had left the store with no manager present for a short period, had given the safe combination to a store employee, and frequently was late to work. [Docket No. 44-10, at 14-15; Docket No. 44-12, at 8.] Paich admits to the incident with the cart, but denies or offers explanations for the other incidents. [Docket No. 64, at 5.]

In November 2002, Sweda met with the management team at the Grove City store. Again according to Sweda's declaration, the team expressed much frustration regarding their dealings with Paich, including that they were not made aware of organizational changes, they were unable to express concerns to Paich for fear of anger or retaliation, and that they believed Paich would be unreceptive and defensive if they did bring concerns to him. [Docket No. 44-10, at 15.] In December 2002, Paich showed a naked picture of a woman to store employees. [Id.; Docket No. 44-15, at 11.] At about the same time, Employee Relations received a report from a female employee at the Grove City store that Paich had been told by a female assistant store manager to stop hugging her and to stop discussing his sexual dreams with her, had discussed with male Nike employees how to have anal sex with a woman, made inappropriate comments about female associates and hired only attractive females. [Docket No. 44-12, at 16.]

In January 2003, Sweda met with Paich to discuss these allegations. Again, Paich denied the majority of the allegations, and explained that he had hugged the assistant store manager in sympathy, which would not be repeated. Sweda reminded Paich of Nike's Matter of Respect policy, instructed him to distribute and discuss the policy with the entire store team,

and admonished him to keep the store "G" rated.  Sweda concluded by warning Paich that

corrective action could occur if these incidents continue.  Paich stated that he understood, and

apologized.  Sweda's meeting with Paich was memorialized in a contemporaneous memo she

sent to Melissa Marks, Employee Relations Specialist [Docket No. 44-12, at 17.]

In April 2003, Sweda again received complaints from two female Grove City store

employees, Maryanne Graham and Jennifer Hutchinson, regarding Paich's behavior.

According to the e-mail sent by Sweda to Marks, Graham and Hutchinson had a long list of

complaints, including: Paich's inability to control his anger; throwing away materials on a

corkboard in a fit of anger; Paich won't talk to employees who disagree with him; Paich didn't

help with a store remodel; leaves early most days; jogs close to the end of his shift and then

leaves; and that he slams doors and yells at employees. [Docket No. 44-12, at 18.]  Sweda

discussed these complaints with Paich on April 25, and informed him that she was going to

issue a Written Reminder of the incidents and their conversation.

On May 4, 2003, Sweda forwarded a draft of the Written Reminder to Paich for his

review. [Docket No. 69-5, at 2-3.]  The draft summarized the complaints received from the store

employees.  Paich again disagreed with the substance of the allegations set forth in the Written

Reminder.  At his request, Sweda revised the Written Reminder to remove the reference to

slamming doors. [Id., at 6.]  Paich then appealed the Written Reminder.  It was reviewed by Jeff

Nichols, Sweda's supervisor, who discussed the allegations with Paich. [Docket No. 69-3, at

239-40.]  Ultimately, Nichols approved the Written Reminder. [Id.]

Paich's year-end review occurred in August 2003.  Paich was given a overall

performance rating of "Meets" expectations. [Docket No. 44-4, at 29.]  Under the "Leadership"

category, the review stated that "[w]e discussed that improvement was needed on

professionalism, matter of respect, and communication skills.  You have begun working on

these areas by reading books on anger management, and have worked on opening up lines of communication with your management team." [Id. at 28.] Sweda concluded her written comments with "I am confident with continued focus, you will be able to achieve this goal in FY 04." [Id.]

Paich believed that the anger management books helped his performance. [Docket No. 43, at 9; Docket No. 64, at 9.] The record does not contain any complaints from store employees for the 2004 fiscal year. In June 2004, Paich received his year-end review. [Docket No. 44-5, at 5-11.] He received an overall performance rating of "Excels," the highest rating, and was the only store manager in Sweda's district to receive it. [Docket No. 69-3, at 4.] In Paich's comments on the review, he wrote: "Deb, I want to personally thank you for you[r] help this past year." [Id. at 10.]

On April 20, 2005, Deena Green, a sales associate at the Grove City store, called the Nike Confidential Alertline to complain about Paich. [Docket No. 69-4, at 32.] Green characterized Paich as "one of the worst store managers for whom she has ever worked." [Id. at 33.] She accused Paich of laying down on a counter while employees stocked shelves during a power outage, going for a run instead of helping the employees close the store, hiding behind fixtures and eavesdropping on employees' conversations. She stated that Paich's behavior made people "uncomfortable." [Id.]

On June 10, 2005, Sweda received an e-mail from Kathy Kramer, the shipping and receiving manager at the Grove City store. [Docket No. 44-12, at 27.] Kramer reported that morale in the store was down as a result of the store manager. She suggested that Sweda talk to other members of the staff to get their feedback as well. [Id.]

As a result of this e-mail, as well as the April Alertline call, Sweda and Melissa Buganza, the District Human Resources Manager for the Northeast Region, went to the Grove City store

6

in June 2005 to conduct a "health check." Health checks are performed at Nike to assess the atmosphere at a store, to gauge employee morale and to determine if any issues exist at a store that need to be addressed. [Docket No. 43, at 11; Docket No. 64, at 11.] During the course of the health check, Buganza met with twelve store employees individually, asking each employee, including Paich, the same ten questions. [Docket No. 44-13, at 12, 18-33.] She had telephone conversations with two other employees. According to a summary of her notes prepared by Buganza, the results of the health check showed that employees were nervous of Paich, that he was moody, that the employees did not respect Paich and did not trust him and that morale was "very poor." [Docket No. 44-14, at 35-37.]

The healthcheck resulted in Sweda issuing a "Final Warning" to Paich on July 1, 2005. [Docket No. 64, at 10.] The final warning letter identified eight specific concerns raised by employees during the health check, including his lack of presence on the sales floor, his failure to deliver on commitments, inconsistent communication and interaction with staff, staff's fear of his reactions and retaliation, his hiding behind fixtures and spying, and generally low morale. [Docket No. 44-5, at 13.] The letter also identified nine instances during his employment when similar issues had been discussed him. [Id.] Sweda further stated:

> Let me be perfectly clear with regard to my expectations going forward, Jeffrey - it is wholly unacceptable to lead your team by intimidation. You must change your behavior immediately and become a positive presence in the store. You must spend time with your team on the floor, treat co-workers with respect, trust your team to do their work well, and praise them when they do, correct them appropriately if necessary. I am glad to help you achieve these goals, and if you have ideas about how I can help support you please don't hesitate to bring them up.

[Id. at 14.] The final warning concluded: "As your supervisor, I also have the responsibility to inform you that failure to meet these expectations will result in further corrective action up to and including termination of your employment at NIKE." [Id.]

On July 6, 2005, Paich received his year-end evaluation. He received an overall

performance score of "successful." [Docket No. 44-5, at 23.] After recognizing the financial

performance of the store, Sweda reiterated:

> The biggest area of opportunity in FY 05 is in your leadership and communication skills. It is critical that you accept responsibility for the total environment within your store, and that you actively work on a plan that will improve the morale and motivation of your team. . . .

> It is important to remember that business results are 50% of your total accountables. Team success is the other 50%. . . .

[Id.] Sweda concluded: "Please continue to focus on your leadership and communication skills.

Please let me know how I can assist you in this effort for FY 06. I look forward to seeing equally

strong business result in FY 06, but also expect to see improved Team and people results." [Id.]

Paich contacted Mari McBurney, Nike Employee Relations Manager, on July 20, 2005 to discuss

the final warning. [Docket No. 44-6, at 2.]

On July 25, 2005, Paich again contacted McBurney and Buganza seeking advice

regarding an employee, Deena Green, who had made negative comments regarding customers

of Middle Eastern descent. Both McBurney and Buganza told Paich that it was his responsibility

to coach the employee on the proper conduct. [Docket No. 64, at 15.] According to Paich, he

was later told by Sweda and Buganza to refrain from counseling the employee. [Docket No. 44-

3, at 6.]

By e-mail, dated August 10, 2005, Paich forwarded to McBurney his evaluation of Sweda

for the year. [Docket No. 44-6, at 2.] Under the category "Creating Team Success," he

complained that "Deb has demonstrated a Gender Based Bias/ discrimination in the situations

reviewed and has taken the position of Female employees without seeking the Truth or allowing

feedback from me." [Id. at 7.] Paich also orally informed McBurney that, prior to the health

check, Buganza, who had conducted the employee interviews, had overheard him and another

man joking, misinterpreted it as laughing at her, and confronted him about it. Paich expressed

concern that Buganza had lacked impartiality.  [Docket No. 44-3, at 7.]

In September 2005, Nike's Employee Relations department asked another district manager, Winston K. Jefferson, to conduct an investigation into Paich's allegations. [Docket No. 64, at 16.]  As part of his investigation, Jefferson spoke with Paich to hear his side of the story. [Id.]  Paich had met Jefferson on several prior occasions and felt that they had a "good rapport." [Docket No. 44-3, at 7.]  Paich told Jefferson that he was not sure that Sweda had a gender bias against him, that it might just be a personal issue. [Id. at 7.]  Paich discussed several issues with Jefferson, including his perception that Sweda gave more credence to the female employees' versions of events over his own, and his difficulty handling a group of three of his female employees, Terry Northcott, Dorothy Wilson and Christine Faust, who were friends of Kristine McCoy, his assistant manager of operations. [Docket No. 44-10, at 7-8.]  Jefferson noted that 'it is clear that Jeffrey takes minimal responsibility for the overall environment in his store, which is consistent with past health checks and feedback." [Id.]  In conclusion, Jefferson "committed to Jeffrey Paich that this was [a] step in the process and that the entire ER/HR team would do their best to address the situation fairly and effectively in the best interests of all employees at NIKE." [Id. at 9.]  The results of Jefferson's investigation were provided to McBurney, Buganza and Sweda on September 29, 2005. [Id. at 2.]

On October 24, 2005, Sweda sent an e-mail to Buganza updating her on the Grove City store. [Docket No. 71-5, at 1.]  In her e-mail, Sweda indicated that she would be visiting the store on November 16-17 to "coach the entire team on their store environment." [Id.]  She acknowledged that "it is difficult to tell who is telling the truth, since the information that Mari and I have received is such a mixed bag, and is also almost impossible to substantiate." [Id.]  She advised against Buganza accompanying her, since she had "concerns that [Paich] may become even more confrontational with you present." [Id.]

The next day, on October 25, 2005, Paich sent an e-mail to Dorothy Clingman, McBurney's supervisor. Paich alleged that Buganza had improperly told McCoy about the review that Faust, one of McCoy's friends, was going to receive. According to Paich, this communication "set off a string of Malicious attacks on myself that ended in my receiving a Final Warning Corrective action. Most of these attacks I can now prove and have to some were false (sic). They were planned and perpetrated by someone who does not have the best intentions." [Docket No. 69-5, at 20.] At Paich's request, Clingman had a telephone conversation with Paich on October 27, 2005. During that conversation, Paich complained of gender discrimination against him by Sweda. [Docket No. 69, at 12; Docket No. 69-5, at 23.]

Clingman conducted an investigation into Paich's allegations. By letter, dated November 2, 2005, Clingman shared the results of her investigation with Paich. [Docket No. 69-5, at 22-23.] Clingman found "no evidence of gender discrimination or any other kind of inappropriate behavior on the part of Debra Sweda." [Id.] Clingman assured Paich that "no retaliatory action will be taken against you for having brought this matter to our attention." [Id.]

By letter dated November 7, 2005, Sweda terminated Paich's employment. [Docket No. 44-6, at 19.] The letter stated that his employment was terminated "for unsatisfactory peformance." [Id.] In her deposition, Sweda admitted that there was no "specific event" between the issuance of Paich's final warning in July and his termination in November which led to his termination. [Docket No. 69-3, at 6.] Instead, after discussions between Sweda and Human Resources, they felt that Paich failed to take responsibility for the store environment and that this would not change.

> He did not take responsibility for the environment in his store. He did not take responsibility for the morale and motivation. Nothing was his fault, everything was about – he couldn't look at the big picture. He was unable to see how his team evaluated or looked at him or did not respect him. He demonstrated an unwillingness to attempt to change his performance.

[Id. at 7.]

After Paich's termination, Sweda promoted Kristine McCoy, a woman, to store manager. [Docket No. 69, at 2, ¶¶ 2-3.]

**Plaintiff's Additional Evidence of Discriminatory Treatment**

Paich also submits evidence that purportedly demonstrates that women were treated more favorably than he was. For instance, on August 11, 2005, Jennifer Hutchinson, a merchandise flow specialist at the Grove City store, made a call to the Nike Alertline regarding the conduct of several other women employees at the store, notably Kristine McCoy, the Grove City store's Operations Manager, and Deena Green and Denver Williams, both merchandise flow specialists. [Docket No. 70-2, at 4-5]. Hutchinson complained that McCoy, Green and Williams "ha[d] degraded and demeaned employees since the end of 2003," on a daily basis, resulting in low employee morale. [Id.] She specified several instances where: (i) Green was rude and disrespectful to Hutchinson in front of other employees and customers in August 2004; (ii) McCoy shared confidential information with Williams regarding why a male employee left work early during the week of August 1, 2005; (iii) McCoy referred to a male employee's panic attack as "gay"; and (iv) Green asked Hutchinson if Hutchinson was afraid she was going to hell because she was dating a black man. [Id.] Hutchinson also expressed her belief that McCoy, Green and Williams were attempting to have Paich terminated, and were circulating "gossip and untruths" about Paich and other employees on a daily basis. [Id.]

Sweda testified that she was on leave when this complaint was made to the Alertline, and that she did not see it nor was she aware of it at the time. [Docket No. 74-3, at 3.] She did not know whether an investigation of those allegations was ever done. [Id. at 4.] It is undisputed that McCoy was never interviewed about the Hutchinson Alertline complaint. [Docket No. 69, at 11; Docket No. 67, at 17.]

Teri Burton was a female store manager for the Rehobeth, Maryland store, also under Sweda's supervision. [Docket No. 43, at 20.]  Burton was subject to two disciplinary procedures, a written reminder in 2000 for comments made to an ex-employee and a verbal counseling from Sweda to continue to work on improving her "soft skills." [Docket No. 44-10, at 12.]  According to Sweda, Burton made prompt and significant improvement in this area. [Id.]  Burton repeatedly received good reviews regarding her leadership and communication skills, both from Sweda and from the store employees. [Docket No. 44-10, at 25, 30; Docket No. 44-11, at 8-9, 19-20.]

Ruth McGrath was an assistant store manager at the Williamsburg Factory store. [Docket No. 69, at 13.]  Nike received an anonymous Alertline complaint in April 2004, claiming that McGrath had mistreated three employees after she learned that they were involved in interracial relationships. [Id.; Docket No. 69-4, at 24-25.]  In May 2004, Nike received another Alertline complaint by a Williamsburg store employee claiming that McGrath "harasses her" for no reason.   [Docket No. 69-4, at 26.]  Both of these allegations were investigated by Employee Relations, which made a determination about the need for any action. [Docket No. 68-6, at 14.]  No other evidence was submitted regarding McGrath's performance.

## III.  Defendant's Motion For Summary Judgment [2]

### A.  Reverse Gender Discrimination (Counts I and IV)

Reverse discrimination cases in the Third Circuit are governed by the burden-shifting analysis set forth in Iadimarco v. Runyon, 190 F.3d 151 (3d Cir. 1999).  Medcalf v. Trustees of the Univ. of Pa., 71 Fed.Appx. 924, 927 (3d Cir. 2003).  Under this analysis, a plaintiff must first

---

[2]It is well-established in the Third Circuit that discrimination, hostile work environment and retaliation claims brought under Title VII and the PHRA are subject to the same analysis. Gomez v. Allegheny Health Svcs., Inc., 71 F.3d 1079, 1084 (3d Cir. 1995), cert. denied, 518 U.S. 1005 (1996) (discrimination); Woodard v. PHB Die Casting, 2007 WL 3257201, at *1 (3d Cir. Nov. 6, 2007) (hostile work environment); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)(retaliation).  Therefore, my analysis, though expressed in terms of Title VII, applies equally to the PHRA claims.

establish a prima facie case of reverse discrimination, by "presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff less favorably than others because of his race, color, religion, sex or national origin." Iadimarco, 190 F.3d at 163. "A prima facie case should not be an onerous hurdle to overcome." Macon v. Kings Family Restaurant, 2007 WL 1366789, at *5 (W.D. Pa. May 7, 2007). However, "[d]emonstrating a mere possibility of discrimination will not suffice." Hawthorne v. Mercer Cty. Children and Youth Servs., 2007 WL 2254565, at *9 (W.D. Pa. Aug. 6, 2007).

Plaintiff argues that he has met his burden of establishing a prima facie case of reverse discrimination because he was discharged and subsequently replaced by a woman. (Pl. Opp. Br. at 7-8.) This is incorrect as a matter of law. See Mosca v. Cole, 384 F. Supp.2d 757, 765 (D. N.J. 2005) ("That [plaintiff] was fired by an African-American (Langford) and replaced by an African-American does not give rise to an inference of discrimination."), aff'd, 217 Fed.Appx. 158 (3d Cir. 2007). As the District Court explained in Mosca, "[i]f making such a hiring was by itself a suspicious circumstance, employers attempting to comply with the law would find such efforts used as the basis of a reverse discrimination suit against them." 384 F. Supp.2d at 765. Plaintiff's reliance on the Third Circuit's opinion in Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933 (1997), is misplaced, because Matczak does not involve a claim of reverse discrimination, and holds only that the plaintiff in an ADA case need not demonstrate "that employees beyond the ADA's protection were treated more favorably than he was." 136 F.3d at 940.

In his sur-reply, Plaintiff outlines "all of the evidence" which he argues "proves a prima facie case of gender discrimination." (Pl. Sur-reply Br. at 3.) This includes: (1) he was qualified for the position, which he held for five years; (2) he received excellent and satisfactory

performance ratings in 2004 and 2005; (3) he was replaced by a female, Kristine McCoy; (4) McCoy had previously complained about him to Sweda; (5) Sweda told Paich not to discipline McCoy with respect to McCoy's sexually explicit conversations; and (6) McCoy was the subject of the Hutchinson Alertline complaint and yet not investigated by Sweda or interviewed or disciplined by Nike.  (Id. at 3-4.)  According to Plaintiff, McCoy was similarly situated to Paich and treated more favorably than he.  (Id.)

I find the evidence submitted in support of Plaintiff's prima facie case to be rather thin, to say the least.  "Where evidence of allegedly disparate treatment meted out to 'similarly situated' employees outside of the protected class is relied upon, those individuals must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." Davis v. City of Phila. Water Dept., 57 Fed.Appx. 90, 92 (3d Cir. 2003).  First, McCoy was the Operations Manager, not the store manager.  As such, she was under Plaintiff's direct supervision, rather than Sweda's.  Sweda testified in her deposition that she did not learn of the incidents of McCoy's sexually explicit conversation until later, not at the time the comments were made, presumably when discipline would be most appropriate. [Docket No. 69-3, at 8.]  In addition, McCoy was the *partial* subject, along with Green and Williams, of only *one* Alertline complaint, as opposed to Plaintiff's extensive history of complaints and counseling.  As such, I am hard-pressed to agree that McCoy was similarly-situated and treated more fairly than Plaintiff.[3]

However, Plaintiff correctly points out that the court must look to the totality of the

---

[3] In Plaintiff's Counter-statement of Undisputed Facts, Plaintiff also relies on Defendant's treatment of two other female store managers, Teri Burton and Ruth McGrath, as evidence of disparate treatment. [See Docket No. 69, at 12-14.]  Since Plaintiff did not address these individuals in his briefs, I assume that Plaintiff has abandoned that argument.  In any event, I find that Burton and McGrath did not engage in conduct sufficiently similar and extensive to Plaintiff's conduct such that any differences in their treatment would provide evidence of discrimination.

circumstances in determining whether Plaintiff has established a prima facie case of reverse gender discrimination. Iadimarco, 190 F.3d at 163. Plaintiff has submitted additional evidence, not referred to in his briefs, and generally unsubstantiated apart from Plaintiff's own self-serving statements, that other male store managers felt that Sweda discriminated against men. [Docket No. 69, at 14-15.] Some of this evidence has been rebutted by the men themselves. [Docket No. 44-15, at 8-9; Docket No. 66-2, at 1-4.] However, in light of the mandate on summary judgment that I draw all inferences and resolve all conflicts in Plaintiff's favor, I find that for purposes of this motion, Plaintiff has met his burden of establishing a prima facie case of reverse discrimination.

The burden now shifts to Defendant to articulate a legitimate, non discriminatory reason for the adverse employment action. Armstead v. Norfolk Southern Corp., 2006 WL 544403, at *6 (W.D. Pa. Mar. 3, 2006) (citing Kautz v. Met-Pro Corp., 412 F.3d 463, 465 (3d Cir. 2005)). "The defendant, however, is not required to show that the nondiscriminatory reason was the motivating reason for the rejection/termination." Id. at *9. The defendant's burden "is one of production, not persuasion." Hawthorne, 2007 WL 2254565, at *10 (quoting Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000)). "Thus, it is a minimal burden for the defendant to meet." Armstead, 2006 WL 544403, at *9.

Defendant argues that Plaintiff was terminated based on "his long-standing, well-documented, unsatisfactory performance that had not improved despite numerous counseling sessions and progressive warnings, and which caused the Grove City store to have poor morale, a poor working environment, and many employee complaints." (Def. Br. at 11.) Accordingly, I find that Defendant has met its burden of providing a legitimate, non-discriminatory basis for Plaintiff's termination.

"To defeat summary judgment when the defendant answers the plaintiff's prima facie

case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to *some evidence*, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Iadimarco, 190 F.3d at 166 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)) (emphasis in original). Under the first prong, the plaintiff "must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Hawthorne, 2007 WL 2254565, at *10 (quoting Fuentes, 32 F.3d at 765). Under the second prong, "a male plaintiff can establish that his sex was a motivating or determinative factor in his termination by demonstrating past discriminatory treatment, more favorable treatment of similarly situated females, or discrimination against other males." Id.

Defendant, citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313 (3d Cir. 2000), argues that, because his termination was purportedly based on poor leadership skills, an essentially subjective criteria, that rationale cannot defeat a prima facie showing of discrimination. (Def. Opp. Br. at 8.) I disagree. While termination decisions based on subjective criteria should be subject to enhanced scrutiny, inasmuch as they may be used to mask pretext, Goosby, 228 F.3d at 320, the fact that a termination decision was based on subjective criteria does not alone raise a sufficient inference of pretext to defeat a motion for summary judgment. "A plaintiff must identify some other evidence from which a reasonable juror could consider the subjective criteria to be a mask for discrimination." Snooks v. Duquesne Light Co., 2008 WL 351685, at *5 n.11 (W.D. Pa. Feb. 6, 2008).

Here, the evidence supporting Defendant's termination decision consists of substantially more than Sweda's subjective evaluation of Plaintiff's performance. The record demonstrates,

as detailed above, that, beginning in September 2002, employees at the Grove City store repeatedly complained about Plaintiff's leadership and management skills and inappropriate conduct. These complaints were made to Sweda, to Nike's confidential Alertline, and to Buganza, and were reviewed and investigated by Sweda's supervisor, Jeff Nichols, by Mari McBurney, by Dorothy Clingman, and by another district manager, Winston Jefferson. The evidence shows that Sweda (and her supervisors and the employee relations department), attempted to address these complaints, raised them repeatedly with Plaintiff, and offered their continued support of his efforts to improve his management skills.

While Plaintiff argues that he was treated more harshly than his female counterparts, the record does not support that assertion. First, Plaintiff has not cited to a single other employee of Defendant, let alone a store manager, that was the subject of repeated, detailed complaints over a course of years. See Schwoebel v. Catholic Diocese of Pittsburgh, 2007 WL 4302097, at *5 (W.D. Pa. Dec. 6, 2007) (no genuine issue of material fact exists where plaintiff did not "point to any other teacher who had a similar quantity of parental complaints, yet was retained"). Moreover, notwithstanding these years of complaints from employees in Plaintiff's store, Sweda continued to offer support and guidance to Plaintiff. She praised him when his management performance improved, albeit temporarily, and even defended him to third parties. [Docket No. 44-5, at 9.] While the record shows that Sweda and Plaintiff's relationship had deteriorated by 2005, Plaintiff admitted to Jefferson in September 2005 that he was not sure that Sweda had a gender bias against him, that it might just be a personal issue. All of this strongly contradicts Plaintiff's claims of reverse gender discrimination.[4]

_____

[4] Plaintiff relies on his Answers to Defendant's First Set of Interrogatories [Docket No. 69-12, at ¶¶ 9, 10, 14, 21] to support his argument that "[m]ale managers were treated less favorably both in [Sweda's] district and nationally." (Pl. Opp. Br. at 11.) "To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [gender] was a motivating or determinative factor in the employment

17

Plaintiff places heavy reliance on the so-called "smoking gun" e-mail from Sweda to Buganza on October 24, 2004, (Def. Opp. Br. at 9.), in which Sweda states in connection with an upcoming visit to the Grove City store that "it is difficult to tell who is telling the truth, since the information that Mari and I have received is such a mixed bag, and is almost impossible to substantiate." [Docket No. 71-5, at 1.]  This vague statement, while it alludes to some question regarding the factual underpinnings of some the complaints at the Grove City store, does not cast into doubt Plaintiff's entire employment history.  If anything, it shows that Sweda, far from leaping to blame Plaintiff, was aware that the (unspecified) issues at the store might have more than one side.  Similarly, the Alertline complaint made by Hutchinson in August 2005, which implicated the behavior of McCoy, Green and Williams and expressed her belief that they were attempting to have Paich fired, [Docket No. 70-2, at 4-5], does not belie the long and well-documented history of Paich's management problems.  Indeed, by the time both these events occurred, Paich had already been issued his Final Warning.

Plaintiff's additional evidence of pretext does not meet his burden.  Plaintiff argues that the allegations made against him in the complaints were false. (Pl. Opp. Br., at 62; Pl. Sur-reply Br., at 5.)  In a discrimination case, the issue before the court is not the fairness of an employer's decision to terminate the plaintiff, but whether the record raises an issue of fact as to whether the decision was motivated by discriminatory animus.  Brokenbaugh v. Exel Logistics N.A., Inc., 174 Fed.Appx. 39, 45 (3d Cir. 2006) ("To show pretext, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

_____

decision." Simpson v. Kay Jewelers, 142 F.3d 639, 644-45 (3d Cir. 1998).  I find that the unsubstantiated, hearsay statements referred to by Plaintiff in his Answers do not meet this standard.  I also note that at least two of these statements were expressly refuted by submissions of the actual declarants. [See Docket No. 44-15, at 8-9; Docket No. 66-2, at 1-4.]

prudent, or competent.") In other words, "the pretext issue is not whether [the defendant] had cause to terminate [the plaintiff], but rather whether it believed it had such cause and acted upon its belief." Id.

Plaintiff also argues that Sweda took the complaints of the female employees at face value, and Plaintiff has submitted evidence that he was a good manager and supported by his employees. [Docket Nos. 69-9, 69-10.]  This Court has previously rejected such evidence as having "no relevance as to weaknesses, inconsistencies, incoherencies, or contradictions in Defendant's proffered non-discriminatory reason." Macon, 2007 WL 1366789, at *6.

In summary, Plaintiff has submitted no evidence, either direct or circumstantial, from which a fact finder could reasonably either disbelieve Defendant's articulated legitimate reason for firing Paich, or conclude that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.   Accordingly, I grant Defendant's motion for summary judgment dismissing Plaintiff's reverse gender discrimination claims.

**B.  Hostile Work Environment (Counts II and V)**

Plaintiff alleges in his Amended Complaint that Defendant "discriminated against Plaintiff because of sex by creating a work environment hostile to Plaintiff and to other male managers. . . ." [Docket No. 18, at ¶¶ 50, 56.]  Plaintiff further alleges that he "experienced pervasive harassment because of gender from Sweda concerning her generalized, nonspecific, subjective assessments of his alleged deficiencies which made it more difficult for him to perform his duties, and when he contacted other Nike officials concerning the harassment and asked for assistance he found that his requests were ignored for months. [Id., at ¶ 23.]

Defendant has moved for summary judgment dismissing Plaintiff's hostile work environment claims, arguing that Sweda's evaluations and counseling of Plaintiff over the course of three years was detailed, and that Plaintiff has no credible evidence to support his claim.

(Def. Br. at 16.)  Despite submitting both an opposition brief and a sur-reply, Plaintiff has not opposed Defendant's motion for summary judgment on these claims.

"In the event that the non-moving party does not file a brief in opposition, it is well-settled that a moving party is not automatically entitled to summary judgment."  Sprague v. Neil, 2008 WL 140718, at *4 (M.D. Pa. Jan. 10, 2008) (quoting Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990)).  "Federal Rule 56(e) specifically states that summary judgment for the moving party shall be granted only *if appropriate* as a matter of law." Id. (emphasis in original).  "A district court must conduct a merits analysis of the moving party's motion even in the absence of opposition."  Id.  "Failure to oppose a motion for summary judgment constitutes merely a waiver of the opponent's right to controvert the facts asserted by the moving party in the motion for summary judgment or the supporting material accompanying it."  Id.

"To prevail on a hostile work environment claim, plaintiff must establish that (1) plaintiff suffered intentional discrimination because of [his sex]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; and (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position."  Pergine v. Penmark Mgt. Co., 314 F. Supp.2d 486, 494 (E.D. Pa. 2004).  "The inquiry into whether an environment is hostile requires the consideration of all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Cole v. Delaware Tech. and Community College, 459 F. Supp.2d 296, 307 (D. Del. 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "That analysis must concentrate not on individual incidents, but on the overall scenario."  Id. (quoting Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999)).

The record does not contain evidence of the sort of pervasive and regular discrimination that would rise to the level of creating a hostile work environment. Sweda's reviews of Plaintiff's performance at all times contained both positive and negative elements. In 2003, Plaintiff even received a rating of "excellent." While Sweda and other members of Nike's management investigated the numerous complaints made against Plaintiff, Plaintiff was provided the opportunity to address those complaints, and Nike employed a graduated system of discipline, which included oral counseling, reviews, written notices, and a Final Warning. The evidence also shows that Plaintiff even thanked Sweda for her help in improving his management skills. In short, there is no evidence in the record to support Plaintiff's hostile work environment claim. Accordingly, I grant Defendant's motion for summary judgment dismissing Plaintiff's hostile work environment claims.

## C. Retaliation (Counts III and VI)

"To advance a prima facie case of retaliation, a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). If the plaintiff satisfies this burden, then the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the plaintiff's termination. Scott v. Airtran Airways, Inc., 2006 WL 2711654, at *6 (W.D. Pa. Sept. 21, 2006). Assuming the defendant satisfies its burden, then "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that the retaliation was the real reason for the adverse employment action." Id. "Accordingly, the employee must produce evidence that the retaliatory animus played a role in the employer's decision making process and that it had a determinative effect on the outcome of that process."

Id. (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997)).

I find that the record contains sufficient evidence that a reasonable fact finder could conclude that Plaintiff's termination was the result of retaliatory animus. Plaintiff received his Final Warning on July 1, 2005. On July 6, 2005, Plaintiff received his year-end evaluation. While raising the issue of his leadership and communication skills, Plaintiff received an overall rating of "successful". Sweda concluded: "Please continue to focus on your leadership and communication skills. Please let me know how I can assist you in this effort for FY 06. I look forward to seeing equally strong business results in FY 06, also expect to see improved Team and people results."

While Plaintiff originally raised the issue of Sweda's "gender based bias/discrimination" in his evaluation of Sweda, forwarded by e-mail to McBurney on August 10, 2005, he later backpedaled and told Winston Jefferson in September 2005 that he was not sure Sweda had a gender bias against him, that it might just be personal. However, during a phone conversation with Clingman on October 27, Paich complained of gender discrimination against him by Sweda.

Prior to this conversation, there is evidence that Sweda had no intention of terminating Plaintiff. In an e-mail message she sent to Buganza on October 24, she referenced an upcoming trip to the Grove City store on November 16-17 to "coach the entire team on their store environment," including Paich. Nevertheless, by letter dated November 7, 2005, seven days after Plaintiff complained of gender discrimination to Clingman, Paich's employment was terminated by Sweda. This Court has recognized that "[t]emporal proximity between the protected activity and the alleged retaliatory act may be, in itself, sufficient to support an inference of causation where the temporal relationship is unusually suggestive of retaliation." Scott, 2006 WL 2711654, at *6.

In any event, my determination is based on more than just the temporal proximity of

Plaintiff's complaint and termination. Plaintiff had a long history of poor reviews of his communication and leadership skills, none of which had resulted in his termination. As of October 24, 2005, there was no indication that Sweda intended to terminate Plaintiff. Indeed, Sweda admits in her deposition that there was no "specific event" between the issuance of Plaintiff's Final Warning in July and his termination in November which led to his termination. Based on the foregoing, a reasonable fact finder could conclude that there *was* a "specific event," and that it was Plaintiff's complaint of gender discrimination. Accordingly, I deny Defendant's motion to dismiss Plaintiff's retaliation claims.

**IV. Defendant's Motion To Strike Inadmissible Allegations [Docket No. 65]**

Defendant has moved to strike as inadmissible hearsay various statements set forth in paragraphs 6, 7, 24, 26, 38, 50, 58, 78, 96-97, 99, 111, and 119-120 of Plaintiff's Response to Nike's Statement of Material Facts [Docket No. 64]. The Third Circuit has followed the Supreme Court in "reject[ing] the view that the non-moving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990) (citing Celotex v. Catrett, 477 U.S. 317, 324 (1986)), cert. denied, 499 U.S. 921 (1991). Hearsay evidence may be considered on summary judgment "if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that would be admissible at trial." Id. (citing Williams v. Borough of West Chester, 891 F.2d 458, 465-66 n.12 (3d Cir. 1989)); see also, Coleman v. Cerski, 2007 WL 2908266, at *6 (M.D. Pa. Oct. 4, 2007) ("Hearsay statements that would be inadmissible in court, therefore, cannot be considered in deciding a motion for summary judgment unless the out-of-court declarant could later present that evidence through direct testimony.")

The statements contested by Defendant could, in theory, later be presented through the direct testimony of the persons purported to have made the statements. Accordingly, I deny

Defendant's motion to strike in its entirety.[5]

## ORDER OF THE COURT

AND NOW, this 12 day of March, 2008, after careful consideration, and for the reasons set forth in the accompanying Opinion, Defendant's motion for summary judgment [Docket No. 41] is granted with respect to Plaintiff's claims for reverse gender discrimination and hostile work environment, and is denied with respect to Plaintiff's claims for retaliation.

IT IS FURTHER ORDERED that Defendant's motion to strike [Docket No. 65] is denied.

A settlement conference is scheduled for Wednesday, March 26, 2008, at 10 a.m. before the undersigned.  Counsel are to have settlement authority and parties are to be present or available by telephone.  Position letters are to be faxed three (3) days prior to the conference.


BY THE COURT:

 /s/Donetta W. Ambrose

Donetta W. Ambrose,
Chief U.S. District Judge

---

[5]Defendant's motion also seeks to overrule certain objections made by Plaintiff to Defendant's Statement of Facts.  This portion of the motion is denied as moot absent any formal motion by Plaintiff to strike Defendant's Statement of Material Undisputed Facts.